The case this morning is Romala Stone v. Home Depot. Before we go to our first case, I think we have some other business, and the Court, in its other business, would like to acknowledge its most respected dean of the Court, Judge Friedman. I have an admission to move. I am pleased to move the admission of James Eugene Burke IV, who is a member of the Bar and Good Standing of the highest court in California. I have knowledge of his credentials and can assure the Court that he possesses the necessary qualifications. Do we need to actually ask him to recite on 112.6, maybe, or explain the written description doctrine, or something esoteric? I think we can take a chance and grant this one. Okay, we'll grant this one, then. Please raise your right hand. Do you swear or affirm that you will support yourself in the determination of the counsel of this Court, and that, by law, you will support the Constitution of the United States of America? I do. Congratulations, and welcome to the Bar of the United States Court of Appeals. Well, we didn't waste any questions on that fine young lawyer, so we'll save them for you, gentlemen. Ramallah Stone v. Home Depot. Mr. Parsekian? Parsekian. Parsekian. I was close. You may proceed. Thank you, Your Honor. contractual obligation to continue to buy and sell Ramallah's product. They wanted to cut out the middleman and make it themselves. So they learned the patented process while the patent was pending, and after it was issued, cleared Ramallah's product out of its stores and replaced it with their own copycat Pegasus product, driving Ramallah ultimately out of business. And these bad acts, as alleged, give life to the unfair competition claim as well. So the three claims that are before the Court, the three issues, are really inextricably intertwined. They all happen together, and what makes this case somewhat unique is that these were not two ships passing the night, two companies where one infringed on the other and never met, except for in a patent infringement case. These were two companies that had an intimate business relationship, a successful one together, and that relationship was used to facilitate the patent infringement. What has all of this got to do with the questions as to the meaning and validity of the patent? Yes. In the district court, the court really focused in on two words, very supportable, and that's really where it goes. Why did you amend the claims to include that? The price-affordable phrase, which in total is price-affordable to the average consumer, and again, average consumer was construed and accepted, not an issue here, but that phrase really, I have two responses to that. One is the phrase is preamble. I don't contend that it's a limiting phrase. It was added in the face of standing rejections, and it was added following a telephone conversation with the examiner and resulted in the allowance of the claim. Yes. So I think it is quite clear from that that this subject matter was considered by both the applicant and the patent office to be a patentable consequence, correct? I don't believe that is that correct. Correct or not correct? I don't… It was a patentable consequence. It resulted in allowance. It was added to the preamble to the claim, but the claim having the words comprising the steps of following those words that we're discussing really is what lays out the body of the claim. There were amendments to the body, and there were amendments to the preamble, and together those amendments resulted in allowance. We don't know exactly what was added, why, because there's no explanation in the record. Yes. So we have to take as a given, do we not, that all of these expressions were added and have patentable consequence? I'll give a short answer to that and then move on to then assuming that that's true and make a response to that. Well, tell me why it's not true. You can't just say, well, it's because it's in the preamble. Yeah. The object of the claim was to deliver this… This is my answer to that. The object of the claim is to deliver this product never before done to the market at a price way lower than ever before possible. And throughout the specification, it's sprinkled throughout the specification, it's a discussion of price and how it had never before been possible. So to add it to the preamble, I think, was done as more of a discussion of the purpose following on the objective of the claim, which you see in the specification. So really, I think of it as an instruction, a purpose. Why is it new, novel, and useful, most importantly? And so you have it in Column 2 in the patent where it talks about the object of the claim. Then you have it in the preamble. Well, my first argument is that that doesn't necessarily make it limiting. I think it more instructs the steps that follow. Are you saying that this is not a limitation of the claim? I'm sorry? Are you arguing that those words in the preamble are not a limitation on the claim? My first position is that, Your Honor, as I stated to Judge Lynn. However, I'll move on from that and say, if the court assumes, arguendo, that it is a limitation of the claim, that is clearly defined in the specification throughout. Price, affordable, is discussed in the specification. What is it? Let me tell you what bothers me about this. Suppose I'm a competing manufacturer. I want to manufacture this product, and I copy it. But I say, I'm not infringing because my product is not at a price affordable to the average consumer. How can someone know what the answer to that is? What is a price affordable to an average consumer? First of all, you've got a question, what's an average consumer? But a price affordable, I mean, different people might. I might consider a pair of shoes for $300 as affordable. Someone else might not with my identical income. I just don't understand exactly what this, assuming it's a limitation, I don't understand what it means. Well, the special master in the claim construction process determined that affordable meant that you did not have to incur the additional cost of hiring custom fabricators, etc. That was in the claim construction. There's nothing in the claim that imparts a comparator or a, you know, price affordable means price less than something else. And even if it did, I'm not sure that helps you much. The problem I have is similar to the problem I think my colleague Judge Friedman has. And that is that you, in the course of prosecution, the applicant who had the power of the pen and was free to craft amendments as he or she chose, used an expression, injected a price point, a capability of enabling this fabrication and sale of these commodities at a certain price point. But the price point is undefined. The language used, price affordable, you know, is a wonderful expression. We see it all the time. We see it all the time in marketing and promotion material. Okay, come in and buy this. It's an affordable price. The marketers love it. Why? Because it doesn't mean anything. Well, I think that in the claim construction process, we did define that. And that is that affordable, that it's looking at it logically, looking at its plain meaning, giving it its effect, as we all know these words, that it simply does mean that. That it would be disingenuous for someone who's looking at the patent to say, I don't know what that means. Who is the someone? A person who's looking at the claim to determine whether or not. You're looking at whether one of skill in the art would understand this term. Right. If we look at column two lines 51 through 55, they say the price would be attractive because the cutting of the stone today is done by specially trained persons, essentially defining this affordability in terms of not using specially trained persons. Right. One of skill in the art would understand that it's not subjective. Right? Yeah. That's your argument. Yeah. Yes, because... And particularly on 112.6, that's a pretty hard argument to overcome, isn't it? Well, yeah. Let me ask you another question. The word affordable, to me, connotes a relationship to the income of the purchaser. Something may be affordable to a person with an income of a million dollars a year, but wouldn't be affordable to someone with an income of $20,000 a year. So, I don't see that affordable can be translated as meaning to a person of ordinary skill in the art, how it was made, who did it, where it was made, etc. It's whether they, in their financial position, would be able to handle the cost of this product. Respectfully, Your Honor, I just don't see it that way. I think that if you give it its plain reading, and that people, that you do know, the product is meant to be delivered to box stores, to be sold off the shelves. And the industry has been around, stone cutting has been around a long time. And we all know that for years and years... This product was sold on the shelves, and the price was, an absurd example, but it's a test, and the price was $5,000. Would you say that was affordable to the average customer? No. Why not? And the market will dictate that. Why not? But it's not asking for a price, it's asking you to eliminate the specially trained person, right? That's part of the process of getting that stone top in place. It has always required hands to cut and fabricate and install, which is a highly skilled thing that needs to be done, and it's very expensive to do. It's never been done any other way. This invention is at the source to assembly line cut, natural stone, granite, delivered to market in plurality, such that the cost is so low that on the market people will be looking at a price of maybe $150 instead of $3,000. That's what will happen if the invention is practiced. And I believe that in the specification that is laid out specifically. I don't think we can look at that and say that we don't know what affordable means in the context of this patent. If a manufacturer is selling both the pre-cut boxed units that are described in the body of the claim and also selling custom cut and crafted granite tops at the same price, is that party in French? If a manufacturer decides that the countertop is the pre-cut one is $1,000 and the custom one is $1,000. I have to cut either one and it doesn't make any difference to me. There's a convenience factor. Some people want to come into my store and buy something off the shelf. Others are satisfied to wait, but I'm going to sell it at the same price point. Is that party in French? It's not possible because the market would not demand that. The market wouldn't permit it. You wouldn't have. It could not happen. If you read the invention, the claims, that scenario is just not hypothetical. It's not going to happen. You're not going to have somebody selling something for $200 as custom fabricated. As absurd as hypothetical might be, would that party be an infringer in your mind or not? If the party was selling the pre-cut assembled package standard size top for $200 along with the custom for $200, yes. Yes, that would be an interesting trick, but the market wouldn't permit it. They would or would not infringe then? They would be infringing. If they were selling the pre-cut standard size box product as laid out in the claim for this affordable price, they would be infringing on the patent. I'm going to save you a little time, Mr. Parsikian. Yes. I would like to turn to the contract quickly, if I may. Go ahead. Very quickly. The breach of contract, the court also held that the contract was indefinite, overlooked Georgia law, ignored Georgia law, and said there was no mutuality of obligation. There was a mutuality of obligation. Home Depot is required to buy the product, continue to buy it, continue to sell it, to quote, promote and market it in good faith, which is in the body of the contract. Well, but you're ignoring the language at stores agreed, mutually agreed upon. Right. Suppose they could never mutually agree on any store in which they would sell the product. Have they violated the contract by not taking it? That's not what mutually agreed upon means in this contract. I didn't ask you. I'd like to know my hypothesis. Okay. Because it seems to me this is a contract that is quite specific and quite detailed, and when I read, I've read the contract several times, and I cannot see in the language of this contract any obligation on the part of the seller to take or handle any particular products except for products which would be sold in stores to be mutually agreed upon later on. That answer was, that question was answered by the man who drafted and signed the contract himself, Gene Boisseau, whose testimony was before the judge. He didn't, he ignored it. He didn't even mention it in his ruling. That man who drafted the contract for Home Depot, who negotiated, who signed it, said under oath, in deposition that I took, this contract means X. What he said was to continue, the obligation was continued. How much did he have to buy? How much did they have to buy? He explained it as Home Depot does all its business. It's a rolling out basis. How much were they required to buy? As it was continuing to sell region by region throughout the country. It wasn't required to buy anything, was it? Yes, it was. The requirement was. How much? To continue as exhibition. No, no. I mean, suppose they said we'll buy 10 of them. Could the others, could your client have said, now that violates the contract, you have to buy 100? That's where we go back to the mutually agreed upon clause. That's why the word mutual is in there. The way they do business is they get together with the vendor. They, and this is what happened in this case. They come up with the plan on quote how much. That's how they determine it. They don't do it on their own. They don't, this is a box store. It's like a flea market. They look at the vendor and they say let's work together. Let's decide how best to roll this product out. That's what they do with each other and that's what they did here. Then they make the determination mutually. That's what mutually agreed upon means. And so if they agree that they don't want any, that means the mutual agreement is zero, right? No, because the obligation of Home Depot. It has to be mutual. You just said it had to be mutual. Home Depot says, well, we don't think we're rolling any over. We'll take zero. And your response is? The contract says that they are required to purchase and promote and market. That's the purpose of the whereas clause. But you keep ignoring the qualification to provide and market, et cetera, et cetera, of said products. And said products are the products they've agreed upon to sell at a particular store. It seems to me, the language to me is unambiguous. And it does not, to me, impose any requirement that Home Depot purchase any particular amount. Well, the mutual, the word mutual, it means they determine, that is how we testify, the man who signed it. But that testimony can't change the language of the claim form. So they agreed to agree in the future. No. But the trouble is they didn't agree in the future. No. Look, in the answer to the complaint, Home Depot admitted that they started out with their, quote, in their words, pilot program, which is the way Home Depot does it. It's in a certain amount of stores, and then it rolls out from there. They admitted in their complaint. They admitted they signed the contract. They admitted they started with the program. They admitted that they increased the stores. It's an admission in the answer to the complaint. So they don't know exactly. I think it would be disingenuous to do it any other way. There's no requirement in the contract for any minimum purchase, is there? There is a requirement to purchase the product. To where in Georgia? Answer my question. Yeah. Is there any requirement in the contract that Home Depot purchase a minimum? Number of units. It requires Home Depot to purchase the product. You're not answering my question. Well, because I can't assign a number to it, because that's not the way they sign it. Well, that would be a fatal new case if you can't assign a number. The minimum is the pilot program, if I have to use their own words. Well, I don't see that in the contract. It's in their answer. They admitted to it. That's what their requirement is. Well, but we have to interpret the contract. Right. Well, the Georgia law requires to look at the contract to try to give it its plain meaning and to give it structure, the intent of the parties. The job is to find out what are these guys trying to do. I mean, I think Georgia law, and it is certainly in our briefs, goes over and over again, really tripping over themselves to say, look, what are these guys trying to do? And the answer to that is answered in the contract and in the deposition testimony that I took. And that is that they get together, they mutually agree upon the start of the program, what they call a pilot program, which is in a plurality of stores, and then they continue to roll it out and increase it across the country. Thank you, Mr. Parsekian. I think you've said that a couple of times. I think we've got that one. On unfair competition, Judge? I think we've expired. We've used our time, Mr. Parsekian. We'll give you your three minutes back. And if you'd give Mr. Clement an additional six minutes on his regular time, that will keep the time even. Of course. Thank you, Mr. Parsekian. So you have 21 minutes if you need it, Mr. Clement. Thank you, Mr. Chief Judge, Your Honors, and may it please the Court. Ramallah Stone seems to have buyer's remorse on a number of the strategic litigation decisions they made below. In the proceedings below, they never took issue with the idea that the key term, price affordable to an average consumer, was a limiting term that had to be construed. They proposed their own construction. They had their experts support their proposed construction. They went so far in the district court proceedings to essentially mock Home Depot for wasting four pages of its brief, trying to make clear that this was a limiting term. That's a joint appendix, page 999. Mr. Clement, you obviously perceived from my earlier questions that I have some concerns about this term, price affordable. But on the other side of the coin, the specification does seem to talk about some relative meaning of that term, relative to the cost of a custom-cut piece of ground. So why, given that our standard of 112 ambiguity is that it be insolubly ambiguous before it can be declared invalid, why is it not appropriate for us to interpret this term, give it some meaning, and give it the meaning that might be gleaned from looking at the specification in general, that is, it's a price that isn't burdened by the cost of custom-cutting? Well, Your Honor, a couple of responses. First, I think if you look in the specification, as we suggest in our brief, that just creates more problems than it solves because the specification talks about this being affordable and that the problem with custom-cutting is that's only affordable by an affluent customer. And, of course, there's another relative term that's not defined. The other thing, Your Honor, is it does seem— We have relative terms all the time in patent law. Every claim that I've read always has a relative term in it. The question is whether one of skill in the art would be able to discern the meaning of that anyway. Why wouldn't one of skill in this art understand that you're cutting out the custom-skilled worker and that's what is meant by the affordability? Well, Mr. Chief Judge, I think there's sort of two ways someone skilled in the art could try to make sense of this term. One would be to try to make sense of its more straightforward iteration, and I think it just wouldn't work for the reasons that were discussed in the first 15 minutes. The best method that might be available is the one that you suggested, which is to try to say, well, all this means is it's not custom-cutting and custom-cutting is expensive. But I don't think that works for a couple of reasons, Your Honor, with respect to what I think was the particular statement in Column 2 that you were wanting to— Yes, 51 through 55. I'm sorry, you're at lines— 51 through 55. 51 through 55. And there is that statement here. I actually thought you were referring to the key where they state the objects of the invention, and this seems to me to get to the problem. Yeah, that would work too. Well, okay, but the problem there is they say so it is available to the average consumer, and then they say particularly the do-it-yourselfer, which suggests to me that the do-it-yourselfer is a subset of those to whom it's been made affordable to. And what that brings me to, I guess, is the broader point, which is this patent in various places already gets to the notion that what's going on here is that you have an easily installable product that's not custom-installed, that doesn't have to be custom-cut. I mean, that's in a sense the whole point of it's pre-cut top to a retail for sale to and installation by the average consumer. So I think if you read this price affordable to the average consumer to simply mean not pre-cut, then you've essentially read it out of the patent entirely. And I think that's really the problem the district court had here, which is—and if you go to the prosecution history, I think it's relevant that when the inventor put the affidavit in, and this was at the end of the process right before they finally convinced the examiner to allow the patent, when they were talking about the affordability concept in that affidavit, it was in the conjunctive with installation. And so they were talking about a product that was affordable to the average consumer and installable by the average consumer with the suggestion that those are different concepts. So I think that's the problem with trying to simply say all this means is something less than a custom installation. Could I move you to the unfair competition claim? The district court says this is preempted by patent law, but of course patent law has no test about likelihood of confusion of consumers. That seems to be a very different form of legal protection. Did the district court err on this? Well, no it didn't, Mr. Chief Judge. Let me try to make two points about that. First is, even if we assume for present purposes, which is true, and was actually agreed upon by the parties below, that there is an element of the Georgia law of unfair competition that is likelihood of confusion. That was in play in this case. And that was the primary reason, I think, why the district court rejected this claim. I mean, put federal preemption aside for a minute. I mean, if you're going to bring a state law claim, your first burden is to plead an adequate state law claim. And here there's nothing in the complaint that pleads the element. Is there enough in the complaint to survive a 112-6? As we know, that's a pretty minimal requirement. Well, there's not. And there's not for two reasons, Your Honor. One is because there's nothing that goes to the pleading of that element at all. And then if you look at, to make matters worse, and the district court judge relied on this. It's in footnote 2 of the opinion of the motion to dismiss, which is at 100 in the joint appendix. He points out that not only do they plead what they plead, but then they come into court and expressly disclaim any trade dress claim whatsoever. And so, I mean, it's worse than just not pleading likelihood of confusion. They affirmatively disclaim that what at least the Supreme Court has pointed to as being the precise kind of likelihood of confusion that avoids preemption, which is essentially a trade dress claim. Isn't it fair to say that what we have here is more akin to a failure of pleading, a 12B-6 problem than a preemption problem? And the district court, of course, did make the adjudication on 12B-6, albeit in a footnote. I agree with you, Your Honor. First and foremost, it's a 12B-6 problem. The preemption, in a sense, I think, plays an assisting role in that. And the judge relied on both of these. They were clearly alternative grounds. The reason I think they play an assisting role is this isn't just a matter of indifference whether Georgia law has this element, likelihood of confusion. If Georgia law doesn't have that element, then Georgia law would be preempted. And one thing further on just the preemption point, though, I think this is important, and this really goes back to the Supreme Court's Sears against Stifel case. Even if you come in and allege copying and you allege likelihood of confusion, that's not enough. Those were the facts of Sears against Stifel. You have to make clear that the confusion stems from something other than the fact that you're copying the product. And that's what's completely missing here because if you disclaim any trade dress theory and then just look at what's alleged under unfair competition, what's alleged is they copied our product and they marketed a copycat product. But see, isn't that, isn't pleading those facts enough to put the issue of confusion in effect? Copycat products or copycat, why? Because they mimic the other products and cause confusion with them. In other words, weren't the facts enough to put the issues in place, even if they didn't use the word likelihood of confusion? I certainly don't think so, Mr. Chief Judge. But if the facts are enough, that would suffice. We agree on that point, don't we? If the facts are enough to satisfy the element, then the fact that they didn't articulate it as an element, I suppose that's fair enough. But I don't think these facts are enough and I don't think they're anywhere near enough and precisely because I think it gets to this point that it's not enough to come into court and say, well, I have an unfair competition claim and what am I going to allege? I'm going to allege copying. That doesn't get it done because, I'm sorry. No, no, go ahead and finish your thought. My only thought to finish it was if likelihood of confusion stems only from the copying, that's squarely preempted. So likelihood of confusion as a matter of Georgia law, because I don't know why we want to interpret Georgia as likely having a preempted law, has to mean likelihood of confusion as to source, and that's exactly what they disclaimed. All right. I want to bring you back to Claim 1 of the patent for a minute. Just one further question. This term that we've been discussing, price affordable, is in a clause. The complete clause is not really discussed in the briefs. But the complete clause is to enable assembly line production and sale of the top at a price affordable to an average consumer. So it's a clause that addresses or sets forth seemingly a goal or an objective to enable this. Presumptively, to infringe this patent doesn't mean that you actually have to do that, as long as the method you employ is one that would enable the accomplishment of what is set forth. So in that sense, it does sound like it's just a goal or a purpose or an aspiration and not a limitation. What's your comment to that? Well, my comment to that would be I suppose if one were reading this language just in the abstract and one didn't have the benefit of the prosecution history and didn't have the benefit of the way this case was litigated below, one might come to that conclusion. But when I read this Court's cases, they seem to say that language, even if it's in a preamble, can nonetheless be limiting based on a variety of factors, including the prosecution history. And I don't see any suggestion that that doctrine is somehow not applicable if it's not only in a preamble but it's in language that might otherwise at first glance look like a simplistic purpose. But I think that Judge Lynn is giving full meaning to the clause. He's just saying the full meaning puts it in the context of an assembly method. And the assembly method, therefore, leads us back to that Column 2 reference about specially trained custom-designed methods. Which one of skill and the art would understand? I think that's where Circuit Judge Lynn is taking us. And there does seem to be some logic to that. He's not reading it. He's not ignoring it. He's giving meaning to it but in a way that is satisfied by the patent owner. And again, whatever sense that might make, just in the abstract, I think if you look at both the way this case was prosecuted before the examiner and the way that it was prosecuted before the district court, this language is being treated as much more as limiting language. And again, there's the basic history that you pointed out that is, I think, supported by the fact that when in the inventor's affidavit this concept seems to be injected at that point in the proceedings, it's introduced as a concept that's distinct just from ease of installation or obviating the need for a custom installer. I mean, it's an interesting issue here because on the one hand, as you correctly point out, we have clear precedent that where you add subject matter to achieve allowability of a claim, that that subject matter counts and is a limitation. So even if it's in the preamble, then we have precedent that makes that explicitly clear. On the other hand, we have some pretty clear precedent that says if you set forth in a preamble something that is just a purpose or a goal, that's not necessarily limited. So here we have the curious situation where something was added to the preamble at the very end that resulted in allowance, but the subject matter that was added seems to be simply a goal or an objective. So you have both precedents in some tension. Right, and I would say two things, Your Honor. One, I think the more specific precedents are the ones that deal with the specific situation of the prosecution history and allows that prosecution history to be able to take a term that might otherwise not be limited and make it limiting. The second thing, though, I would say is if you were looking for a tiebreaker, I think that actually comes in the way this case was litigated because there's more than just forfeiture or waiver issue here. I think there is strategic behavior. I don't mean that in an overly prejudicial way, but this is a patent that is, I think in fairness, a problematic patent. And if you look at the affirmative defenses that Home Depot laid out, the defenses were not just indefiniteness. They were things like patentable subject matter, but also novelty and also obviousness. And so if in the process of claim construction additional limiting terms can be put into this patent, that is going to help Ramallah Stone down the line defend off some of these other defenses. And I think that may explain why they were so eager before the special master and before the district court judge to make this a term that they were perfectly happy to propose their own construction on, that they were perfectly happy to have their expert on. And then when that didn't work in the district court, because unlike the special master, the district court sort of looks at that term and says, well, you know, that's a limiting term, then it's indefinite, and that renders the patent invalid. Now they sort of have buyer's remorse in this court, and they're trying to change gears. And I think there's an important policy for this court to not allow that. There may be another way to look at this, and that is that since that language, as well as other language, was added to secure allowance, you could say that, well, this is a method claim, and the phrase, to enable assembly line production and sale at a price affordable, is the same as adding another method step that would be enabling assembly line production and sale. That would be a typical method step. So that it does have meaning. It does have consequence. It is the same as any other method step limitation in the claim, which brings us back to square one. What does price affordable mean? So I do think that the tension in our precedent that I alluded to earlier is an interesting one. But at the end of the day, the problem that we have to confront and what we have to decide, I think, is whether the district court was correct in interpreting price affordable and in saying that it is insolubly ambiguous. And I certainly agree with that. That becomes the critical question, and I think on this, the district court's analysis is correct, because I do think that unless you default to the idea that, well, you know, the term just kind of has to go, and we're just going to say that that just means. It's not what the district court thinks it means. It's what one of skill in the art thinks it means. I have a feeling that a construction guy who's cutting table countertops understands what kind of method this is enabling. But I'd like to turn you for a second to the contract claim. Once you have a pattern of conduct, why can't you read that in to achieve the mutuality that is required? Well, I guess one answer would be because Georgia law is very clear that that's not a step that you take, and there were sort of vague allusions to Georgia law in the first 15 minutes. But, I mean, to talk specifics, the Wedgwood Carpets case, which the district court relied on, the Drugline case, which is a more recent application of that, so, you know, time has not passed the Wedgwood Carpets case by. Those are cases where, you know, Georgia has sort of some tough, you know, law that requires mutuality. And both the Drugline case and the Wedgwood Carpets case. But would this pattern of conduct be enough to satisfy that mutuality? It's almost a reliance argument, an equitable reliance, detrimental reliance. They've built up a mutuality based on past conduct. Would that satisfy? No, and Georgia law is crystal clear on that, because both Wedgwood Carpets and Drugline arise in a context where you have some past performance under an exclusivity arrangement. And then one party or the other wants to continue the arrangement further. And so there is some past performance, and, you know, very real past performance. I think in Wedgwood Carpets there was a significant order that was placed. In the Drugline case there's at least references in the contract of substantial consideration passing. But in each case the court said, no, there's nothing here that provides either mutuality or any of the kind of specificity that would be required to meaningfully apply this contract going forward. And that's also consistent with other law. The seal test case is under a requirements contract, and then one party wants to continue it, the other one doesn't. And the court's like, well, we have no idea what the price would be, how much would be ordered. And I think that makes sense in the context of this case, because just to give you, you know, one thought that occurred to me is that if after this exclusive sales arrangement was entered, if I understand the appellant's argument, if they the next day decide, well, we're going to triple our price, then Home Depot would still be required to carry their product, even though they just tripled the price, and it no longer makes any sense. And I don't think that's what the parties understood. I think the parties understood that they were agreeing to an arrangement where as long as they continue to buy and sell the product and have this agreement, there was, in a sense, during that period, something to be gained. There was exclusivity on the one part and good faith marketing on the other part. We'd have a very different case if this was a case where Ramalaston's complaint was during that time when the product was being sold at 463 stores, you guys were mailing it in and you weren't really marketing our product the way it was meant to be marketed. That would be a different case. And the Georgia law is a little less clear whether there's mutuality for that case. But the Georgia law really speaks directly to this question. Does a prior course of dealing somehow give rise to enforceable obligations going forward? And it says, I mean, I think the three cases that are relevant are Wedgwood Carpets, Drug Line, and Seal Test. They're all discussed in the briefs. I do think that those are cases where we have very much the better of the argument. It's worth noting only in passing that Judge Story, who was the judge that ruled on that part of the case, was a superior court judge in the state court system for a number of years. He's familiar with Georgia state contract law, and he had no difficulty applying those cases. Are you suggesting that because these decisions are by a district court sitting in Georgia, interpreting and applying Georgia law, we should give more weight to that than if this had been a decision, say, by a district court in Minnesota? Well, Your Honor, I don't know that I would say that as just a definitive flat rule, but I don't think the court would be remiss in taking that into account in considering this question of Georgia law. You know, these are Georgia Court of Appeals cases. There isn't a definitive word from the Georgia Supreme Court, but I think the fact that the courts applying this law, who do it quite often, didn't have any difficulty coming to this determination is entitled to some weight. Thank you, Your Honor. Thank you, Mr. Clement. Pardon me. I didn't get an answer to my question from Mr. Parsiki, and maybe you can help me. Is there anything in this contract that imposes a minimum purchase order requirement on Home Depot? No, there's not, Your Honor. The relevant contract is this exclusive sales arrangement. It's at page 57 of the joint appendix. It's not a long contract, so I don't know how there can be that much dispute about this. There's nothing about numbers in there. It is a classic agreement to agree. It's worth noting that it does incorporate other terms, other potential contracts, which is the vendor buying agreement and the purchase order agreement, and the one thing that's clear from those is that there's an absolute right on Home Depot to cancel. So I just don't think there's a number there. But there's no language in this contract which one would expect to find. If the contract means what they say it means, that Home Depot agrees to purchase. There's no language like that, a typical language, in a purchase and sales agreement. No, and as I say, in the context of the purchase order agreement, it's very clear that they do purchase, but that they have a right to cancel even that very order. And the other thing is if you look at that agreement, which is, I think it's on the joint appendix, page 555, but, I mean, that agreement looks like an agreement that provides the kind of detail you'd expect. Thank you, Mr. Clement. Thank you very much, Mr. Parseki, and you have three minutes. Thank you. In response, the tiebreaker would be, with respect, the presumption of validity that we have. We have a patent that's been issued by the United States Patent and Trademark Office. Broad terms, but it was issued after four years of fighting back and forth, and we have the presumption of validity. And the datamized case clearly lays out how difficult it is to find for indefiniteness, and you better be real careful if you're going to do that. And datamized also says you have to show it by clear and convincing evidence, which is a very high standard. In the district court's order, all the judge says is the defendant shows by clear and convincing evidence that the claim is indefinite. But it doesn't say what that evidence is. There's absolutely no discussion of it whatsoever. It just says it, and most importantly, the court then goes on and points out that we put in evidence, and our expert, and says we better be careful because Home Depot, in fact, put in no unskilled in the art. So to me, it's fatal. The district court's order right there should be reversed summarily based on that alone. There is no—you can't just say there's clear and convincing evidence and not show it, and it is not shown. As far as the unfair competition claim goes, paragraphs 10 through 17 of the operative complaint, which is the amended complaint, which I drafted, couldn't be more detailed in alleging bad acts. This clearly, under the Rodin case, which is cited by the court even in its order, clearly states facts of conduct that is not patent infringement. It is not just copying. I think counsel had said that you have to show that confusion stems from something other than copying the product. Well, clearly we allege that it stemmed from something other than copying. We allege that they went behind the backs of Ramallah Stone in a scheme to learn how to do something, to talk to other companies into doing the same thing for them, and once they did it behind their back and had it ready to go and released on the market, they then flooded the market with their product and put it in the exact same bays in the stores that Ramallah's product was in. That causes likelihood of confusion. The consumer walks into a store. He's been buying a Ramallah product for two years. He goes to the same bays, sees the same exact standard size, the same exact cutouts, looks at it and says, wait, this is called Pegasus. I thought it was Ramallah. Certainly there would be confusion. That was alleged in detail. But the confusion has to be that the product that he sees is actually a Ramallah product. Isn't that the confusion? The confusion is that this never-before-seen product, which is a Ramallah product, being bought for years, suddenly has something else in its place, and they don't know whether they're getting the quality Ramallah product. Is this something else? Is this something new? What's going on here? We allege that in the complaint. And so clearly the unfair competition claim certainly got beyond the notice pleading level. As far as the contract goes, I guess I cite the People's versus the Citizen National in our brief for the proposition. Yes, it does fill in those terms. I mean, you know, the court made that comment. And that is a concept of equity that goes all the way back. We have to follow those concepts. We have a situation here. Final thoughts here, Mr. Parsekian? Yeah. We have a situation here where a company would get away with stealing the product of a smaller company, copying it, selling it, after making millions of dollars on that company, cutting out the middleman being our client Ramallah in violation of unfair competition principles, patent infringement principles, and the contract itself. Okay. Thank you. Thank you, Mr. Parsekian.